1  **BURSOR & FISHER, P.A.**
   Philip L. Fraietta (State Bar No. 354768)
2  1330 Avenue of the Americas, 32nd Floor
   New York, NY 10019
3  Telephone: (646) 837-7408
   Facsimile:  (212) 989-9163
4  E-mail: pfraietta@bursor.com

5  *Attorney for Plaintiff*

6

7

8

9

10                **UNITED STATES DISTRICT COURT**

11              **NORTHERN DISTRICT OF CALIFORNIA**

12

13  KEVIN SMITH, individually and on behalf of all    Case No.
    others similarly situated,

14                                                    **CLASS ACTION COMPLAINT**
                               Plaintiff,

15
                                                      **JURY TRIAL DEMANDED**
16             v.

17  MIDWEST TAPE, LLC d/b/a HOOPLA,

18                               Defendant.

19

20

21

22

23

24

25

26

27

28

Plaintiff Kevin Smith ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant Midwest Tape, LLC d/b/a Hoopla ("Defendant" or "Hoopla").  Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.    This class action lawsuit is brought on behalf of all California residents who have accessed and used Defendant's web-based library service, hoopladigital.com (the "Website"), to search for, obtain, or otherwise access reading and audio-book materials (the use of the Website known as the "Hoopla Service").

2.    Defendant aids, employs, agrees, and conspires with Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook") to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected reading preferences.  Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.  By failing to procure consent before enabling Facebook's interception of these communications, and by disclosing such information to Facebook, Defendant violated the Video Privacy Protection Act 18 U.S.C. § 2710 and the California Invasion of Privacy Act §§ 631-632.

## JURISDICTION AND VENUE

3.    The Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the Class, and there is minimal diversity as Plaintiff Smith resides in a different state than Defendant.

4.    The Court has personal jurisdiction over Defendant because Defendant operates and does business in the State of California.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE PARTIES

*Plaintiff*

6.      Plaintiff Kevin Smith is a citizen of the state of California, over the age of 18, and lives in Oakland, California with an intent to remain there.  Plaintiff is therefore a resident of California.

7.      Plaintiff has used https://hoopladigital.com on a web browser to check out reading materials in connection with his San Francisco Public Library account since approximately March 2021.  From approximately March 2021 through the present, Plaintiff regularly accessed hoopladigital.com to search for and borrow books and audiobooks through his Hoopla account on a web browser.

8.      When Plaintiff used the Hoopla Service to search for or view reading materials, Defendant intercepted his communications with the Website that searched for or obtained books and audiobooks.  Defendant then disclosed this information in conjunction with Plaintiff's personally identifiable information to Facebook.  Specifically, as a result of Defendant's unlawful conduct as alleged herein, Facebook helped Defendant intercept and collect information about Plaintiff's search and borrowing history on the Website.

9.      At all relevant times, Plaintiff never consented to, agreed to, or otherwise permitted Defendant to disclose his personally identifiable information and the record of materials that Plaintiff searched for, viewed, and obtained on the Hoopla Service to third parties, including to Facebook.

10.      Likewise, Defendant never gave Plaintiff the opportunity to prevent the disclosure of his personally identifiable information and the record of materials that Plaintiff searched for, viewed, and obtained on the Hoopla Service to Facebook.

11.      Plaintiff has an active Facebook account which he has maintained for over ten years. During that time, Plaintiff has routinely logged onto his Facebook account on the same web browser he used to access Defendant's Website.

12.     Pursuant to the systematic process described herein, Defendant assisted Facebook with intercepting Plaintiff's protected communications on the Website without his consent, including those that contained personally identifiable information, reading preferences, and video-viewing preferences.

13.     By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected reading and video-viewing preferences to Facebook.

***Defendant***

14.     Midwest Tape, LLC is incorporated in the State of Ohio and has its principal place of business in Holland, Ohio.  Hoopla is a "groundbreaking digital media service that allows" account holders to "borrow movies, music, audiobooks, ebooks, comics[,] and TV shows to enjoy on their computer, tablet, or phone – even their TV!"[1]  Defendant owns and operates the digital library rental catalog and the digital distribution service that partners with libraries nationwide, found at hoopladigital.com.

## FACTUAL ALLEGATIONS

I.     **OVERVIEW OF THE LAW**

A.     **California Information Privacy Act**

15.     The California Information Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

16.     To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

---

[1] HOOPLA, MIDWEST TAPE, https://www.midwesttape.com/hoopla.

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

17.     Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email.  *See Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

18.     As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

19.     A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."  Cal. Penal Code § 632(c).

20.     Individuals may bring an action against the violator of CIPA §§ 631 and 632. Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

### B.     California Patron Use Records Act

21.     The California Legislature enacted the Patron Use Records Act to protect certain privacy rights of California citizens accessing library services.

22.     The California Patron Use Records Act, Cal. Gov. Code § 7927.105, prohibits the unauthorized disclosures of information that identifies a library patron's "borrowing information or use of library information resources" and "[a]ny written or electronic record that is used to identify a library patron."  Ca. Gov. Code § 7929.105(a).  The prohibited records that could be used to identify a patron "include[], but is not limited to, a patron's name, address, telephone number, or email address."  *Id.* at (a)(1).  And the prohibited records that identify a person's borrowing information or use of library resources "includes, but is not limited to, database search records, borrowing records, class records, and any other personally identifiable uses of library resources, information requests, or inquiries."  *Id.* at (a)(2).

23.     The statute prohibits disclosure of such information "to any person, local agency, or state agency," except for use in library administrative duties, with the patron's authorization in writing, or by court order," and creates a privacy interest for Californian library patrons in their personally identifiable information and their borrowing information and library resource usage.  *Id.* at (c).

24.     As can be seen from the enaction of this statute, California has a strong expressed legislative intent to protect the privacy rights of individuals' reading materials and uses of research materials—going to lengths to ban disclosures of which individual searched for or obtained which library materials and library resource information.

1    **C.    California Reader Privacy Act**

2        25.    The California Reader Privacy Act, Cal. Civ. Code § 1798.90, was enacted to

3    further prevent providers of book services from disclosing or being compelled to disclose "any

4    personal information relating to a user of the book service."  Legislative Counsel's Digest to Cal.

5    Civ. Code § 1798.90.  The statute prohibits "commercial entit[ies] offering … book service[s] to

6    the public" from "knowingly disclos[ing] to any government entity," or being "compelled to

7    disclose to any person[] [or] private entity" a user's "personal information."

8        26.    A "[b]ook service" is defined as a service that primarily "provides the rental,

9    purchase, borrowing, browsing, or viewing of books."[2]  Cal. Civ. Code § 1798.90(b)(2).

10   Defendant's Hoopla Service constitutes a book service here.

11       27.    "Personal information" is defined as:

12           (A) Any information that identifies, relates to, describes, or is
13           associated with a particular user, including, but not limited to, the
             information specifically listed in Section 1798.80.

14           (B) A unique identifier or Internet Protocol address, when that
15           identifier or address is used to identify, relate to, describe, or be
             associated with a particular user or book, in whole or in partial form.

16           (C) Any information that relates to, or is capable of being associated
17           with, a particular user's access to or use of a book service or a book,
             in whole or in partial form.

18   Cal. Civ. Code § 1798.90(b)(2).

19       28.    While this statute focuses on prohibiting disclosures of personal information to

20   government entities, the explicit ban on disclosing "personal information relating to a user of [a]

21   book service" further demonstrates California's strong intent in protecting the private reading and

22   book-browsing history of its residents.

23

24

25

---

26   [2] The statute explicitly carves out stores that sell "a variety of consumer products" with book
     service sales "do not exceed 2 percent of the store's total annual gross sales of consumer products
27   sold in the United States," which is not applicable to Defendant here.  Cal. Civ. Code
     § 1798.90(b)(2).
28

## II.    OVERVIEW OF THE PARTIES

### A.    Defendant Provides Digital Library Resources

29.    Midwest Tape "is a full-service media distributor offering a wide variety of … shelf-ready content[] and customized services for" libraries.[3]  Account holders can access the video, reading, and audio content in Defendant's catalog through Defendant's digital media distribution service, hoopla Digital.[4]  Hoopla Digital "partners with libraries around the United States to allow an account holder to "[i]nstantly borrow digital movies, music, ebooks, and more, 24/7 with [their] library card.""[5]

30.    Notably, through the Hoopla Service, account holders can "stream[] … hundreds of thousands of titles … with more being added daily."[6]  Through the Website, Defendant's Hoopla Service allows "people to read, listen, and watch what they want, when they want, and where they want," so long as they have a valid library card.[7]  In sum, creating an account and using Defendant's Hoopla Service "is like having your public library at your fingertips – anytime, anywhere!"[8]

31.    Defendant owns and operates the Website, which provides the Hoopla Service and distributes rental materials to account holders across the entire United States.  Specifically, the Hoopla Service partners with libraries throughout the entire United States to distribute Defendant's catalog of materials directly to library patrons who have created Hoopla accounts.[9]

---

[3] TIME-SAVING LIBRARY SERVICES, MIDWEST TAPE, https://www.midwesttape.com/services.

[4] STORY, MIDWEST TAPE, https://www.midwesttape.com/story.

[5] HOOPLA, MIDWEST TAPE, https://www.midwesttape.com/hoopla.

[6] Id.

[7] STORY, MIDWEST TAPE, https://www.midwesttape.com/story.

[8] Id.

[9] See REGISTER, MIDWEST TAPE, https://www.midwesttape.com/Register ("Access to our web site is granted only to individuals affiliated with a library.").

32.    Account holders can access content on the Hoopla Service as long as their public library has partnered with Hoopla. As of 2022, Hoopla Digital had partnered with more than 8,500 public libraries across the U.S., Canada, Australia, and New Zealand.[10]

33.    Account creation is free, but users must provide their valid library card information and email address to Defendant in the signup process.

**B.    The Hoopla Service Integrated The Facebook Pixel**

34.    Per Plaintiff's counsel's investigation, Hoopla intercepts and discloses to Facebook individual users' personally identifiable information in the form of their Facebook account and the full title of the materials that individuals search for or borrow on the Hoopla Service. This is achieved through Defendant's integration of a piece of tracking pixel called the Facebook Pixel ("Facebook Pixel" or "Pixel") onto the Website.

35.    Per a research paper presented at the Association for Computing Machinery Web Conference 2023, "[a tracking pixel] is a piece of JavaScript code added to a website as a graphic element[, ] 1 × 1 pixel [in size,] that is loaded when a user lands on the website hosting it."[11] "When a user visits a [tracking pixel]-enabled website, an instance of the [tracking] pixel loads in the HTML code of the page on the browser."[12] "[I]f a corresponding … cookie does not exist on the browser, one is created and a unique ID is saved[.]"[13] Then, the tracking pixel's "embedded [] URL point[s] to [a third party's (i.e., Facebook)] servers[] … [and] report[s] to [the third party (i.e., Facebook)] the user['s] activity for the duration of the visit[,]" along "with [the] specific ID reflecting the specific [website user. This] can be used [] to track [] audiences for brand ads[.]"[14]

---

[10] *See hoopla digital Expands BingePass Offering with Addition of Curiosity Stream*, PR Newswire (Jan. 24, 2022 at 5:17pm), https://www.prnewswire.com/news-releases/hoopla-digital-expands-bingepass-offering-with-addition-of-curiosity-stream-301466779.html.

[11] Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with Invisible Pixels and Click IDs*, ARXIV (Apr. 2023) at 2, https://arxiv.org/pdf/2208.00710.

[12] *Id.*

[13] *Id.*

[14] *Id.*

36.    To implement a tracking pixel, a website administrator simply places on their website "[t]he [b]ase [tracking p]ixel code[, which] is a small segment of JavaScript code [that] acts as an 'initiator' for the [tracking p]ixel['s] behavior."[15]  Once active, this code will load "a library of functions [(i.e., fbevents.js for the Pixel] … on the website[.] … This library is the core mechanism[s] of the FB Pixel."[16]  In addition, "the webpage administrator [] define[s] … the behavior they wish to track and report to [Facebook], by defining *events*, i.e., actions, that a user takes on the website."[17]  When in use, the tracking pixels then "reports to [Facebook] information about [each] event and [the] user that caused it," for Facebook's "future use in ad-conversion and further user profiling and tracking[.]"[18]

37.    Defendant discloses users' personally identifying information and the information they viewed or obtained on the Hoopla Service to Facebook so that it can obtain the marketing, advertising, and analytics technological tools that Facebook provides.  Facebook describes itself as a "real identity platform,"[19] meaning users are allowed only one account and must share "the name they go by in everyday life."[20]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[21]

38.    In 2021, Facebook generated $117 billion in revenue.[22]  With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space. [23]

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[20] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[21] FACEBOOK, SIGN UP, https://www.facebook.com/.

[22] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[23] *Id.*at 63.

39.    Facebook sells advertising space by highlighting its ability to target users.[24] Facebook can target users so effectively because it surveils user activity both on and off its site.[25] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[26]  Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[27]

40.    Advertisers can also build "Custom Audiences."[28]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[29]  With Custom Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[30]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[31]

---

[24] FACEBOOK, WHY ADVERTISE ON FACEBOOK,
https://www.facebook.com/business/help/205029060038706.

[25] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[26] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.

[27] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences.

[28] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[29] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.

[30] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[31] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

---

41.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[32]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

42.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[33]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[34]  Advertisers can even create their own tracking parameters by building a "custom event."[35]

43.     One such Business Tool is the Facebook Pixel (the "Facebook Pixel").  Facebook offers this piece of code to advertisers, like Defendant, to integrate into its website.  The Facebook Pixel "tracks the people and type of actions they take."[36]  When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect.  This transmission is initiated by Facebook code

---

[32] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[33] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[34] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[35] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[36] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

and concurrent with the communications with the host website.  At relevant times, two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website— Defendant's own code, and Facebook's embedded code.

44.    Defendant chose to include the Facebook Pixel on its Website.

45.    Facebook's own documentation makes clear just how much tracking of private information the Facebook Pixel does.  It describes the Facebook Pixel as code that Facebook's business customers can put on their website to "[m]ake sure your ads are shown to the right people. *Find … people who have visited a specific page or taken a desired action on your website*."[37]

46.    Facebook instructs such business customers that:

> Once you've set up the [Facebook Tracking] Pixel, *the pixel will log when someone takes an action on your website*.  Examples of actions include adding an item to their shopping cart or making a purchase.  *The Pixel receives these actions, or events*, which you can view on your [Facebook Tracking] Pixel page in Events Manager.  From there, you'll be able to see the actions that your customers take.  *You'll also have options to reach those customers again through future Meta ads*.[38]

47.    The Facebook Pixel code enables Facebook not only to help Defendant with advertising to its own users outside the Website, but also include individual users among groups targeted by *other* Facebook advertisers relating to the conditions about which users communicated on Defendant's Website.

48.    Facebook's Business Help Center explains:

> Meta *uses marketing data to show ads to people who are likely to be interested in them*.  One type of marketing data is website events, which are *actions that people take on your website*.[39]

49.    In other words, Facebook sells advertising space by highlighting its ability to target

---

[37] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (emphasis added).

[38] *Id.* (emphasis added).

[39] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

1    users.[40]  Facebook can target users so effectively because it surveils user activity both on and off its

2    site.[41]  This allows Facebook to make inferences about users beyond what they explicitly disclose,

3    like their "interests," "behavior," and connections.[42]

4          50.    An example illustrates how the Facebook Pixel works.  Take an individual who

5    navigates to Defendant's Website and searches a particular author or video title.  When that search

6    button is clicked, the individual's browser sends a GET request to Defendant's server requesting

7    that server to load the particular webpage.  Because the Hoopla Service integrated and utilizes the

8    Facebook Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back

9    to the individual's browser, without alerting the individual that this is happening.  Facebook causes

10    the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's

11    servers, alongside additional information that transcribes the communication's content and the

12    individual's identity.

13          51.    After collecting and intercepting the information described in the preceding

14    paragraph, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences

15    and Custom Audiences.

16    **III.    DEFENDANT KNOWINGLY DISCLOSES USERS' PROTECTED**
**RENTAL INFORMATION AND ASSISTED WITH INTERCEPTING**
17    **PRIVATE COMMUNICATIONS**

18          52.    Through the Pixel, Defendant assists Facebook with intercepting the identities and

19    online rental activity of Defendant's users on the Hoopla Service, including information relating to

20    the videos that users searched for and borrowed, and the books and audio books that users

21    borrowed.

22          53.    When a user searches the Hoopla Service, Defendant discloses to Facebook through

23    the Pixel the exact keywords that the user searches for.  This means that if a user searches for the

---

[40] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[41] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[42] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

---

title of a book, audiobook, or video, Defendant sends this information to Facebook.  For example, the following image depicts a user searching the Hoopla Service for "Tolkien":



54.     At the same time, Defendant sends to Facebook the following network transmission:

//

//

//

//

//

//

//

55.    In the Universal Resource Locator ("URL") of the request, red squares highlight that the individual user (i) viewed a page (denoted by the "ev=PageView"); (ii) that was viewed on the Hoopla Service located at www.hoopladigital.com; (iii) conducted a search of the catalog (denoted by the word "search"); and (iv) specifically, this user searched for "Tolkien" (denoted by the word "Tolkien").

56.    In that same network transmission, Defendant discloses precisely who the individual user searching for "Tolkien" is.  Defendant does this by disclosing an individual user's "c_user cookie," a unique identifier associated with a single Facebook user's Facebook profile ("Facebook ID" or "FID").  The cookie is a string of numbers that is unique to every Facebook account— distinguishing each FID from its peers.

57.    Any person, even those without in-depth technical expertise, can utilize the FID to identify owners of the FID via their Facebook profile.  Once the Pixel's routine exchange of information is complete, the FID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook FID to www.facebook.com (www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the individual FID's profile page, including all the information contained in or associated with the profile page, for the user associated with the particular FID.

58.    A user who accesses Defendant's Website while logged into Facebook will transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID.

59.    The following image is the same screenshotted network traffic showing Defendant disclosing a user's FID to Facebook via the Pixel when a user searched the Hoopla Service for "Tolkien" except this time, the user's FID is spotlighted:



60.     Due to the integration of the Facebook Pixel on the Website, Facebook is able to intercept the information about the Website page the user viewed.  This information includes the the specific audio visual and/or reading materials the user searched for or borrowed, all of which is included in the URL.  When Facebook intercepts this communication due to Defendant's integration of the Facebook Pixel, Facebook effectively intercepts the exact video and/or reading material(s) the individual is viewing or searching for.

61.     Notably, Defendant even sends to Facebook, through the Pixel, whether the user borrowed materials or played a video.  The following screenshot of the network traffic shows Defendant disclosing to Facebook personal information of a user who borrowed an audiobook version of J.R.R. Tolkien's *The Hobbit*:

62.     And the following screenshot shows Defendant disclosing to Facebook the same user's personal information and the fact that they played the audiobook:

63.     When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

64.     One such cookie is the "fr cookie" which contains, at least, an encrypted Facebook ID and browser identifier.[43]  Facebook, at a minimum, uses the fr cookie to identify users. [44]

65.     If a visitor has never created an account, an even smaller set of cookies are transmitted.

66.     At each stage, Defendant also utilizes the "_fbp cookie", which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user. [45]

67.     The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[46]  Otherwise, the c_user cookie is cleared when the browser exits.[47]

68.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[48]  If that happens, the time resets, and another 90 days begins to accrue.[49]

69.     The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[50]  If that happens, the time resets, and another 90 days begins to accrue.[51]

---

[43] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[44] FACEBOOK, PRIVACY CENTER–COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[45] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[46] Seralahthan, *Facebook Cookies Analysis*, TECH EXPERTISE (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[47] *Id.*

[48] *See id.*

[49] FACEBOOK, PRIVACY CENTER, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 ("For example, the "fr" cookie is used to deliver, measure and improve the relevancy of ads, with a lifespan of 90 days.").

[50] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[51] *See* FACEBOOK, ClickID AND THE FBP AND FBC PARAMETERS, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.

---

70.    The Facebook Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website.[52]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[53]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

71.    Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.  Defendant sent these identifiers alongside the event data.

## IV.    DEFENDANT DISCLOSES USERS' PII AND BORROWING HISTORY FOR THE PURPOSES OF MARKETING, ADVERTISING, AND ANALYTICS

72.    Defendant transmits the foregoing personally identifiable information and record of materials viewed and obtained on the Hoopla Service to Facebook so that Facebook can help Defendant launch marketing campaigns, target specific users with advertising, and analyze Website users' data.

73.    According to Facebook, the Pixel "works by loading a small library of functions which [] can [be] use[d] whenever a site visitor takes an action (called an event) that [a client] want[s] to track (called a conversion)."[54]  The Pixel "relies on Facebook cookies, which enable [Facebook] to match [] website visitors to their respective Facebook User accounts."[55]  Facebook offers a menu of "standard events" that can be tracked, including what content a visitor views or

---

[52] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[53] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

[54] FACEBOOK, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[55] FACEBOOK, META PIXEL GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

purchases.[56]  Advertisers can also create their own tracking parameters by building a "custom

event."[57]

74.    This gathered information is used for marketing and advertising.  Specifically, the

Pixel's library of functions can be used to "[t]rack conversions [] in the Ads Manager[,] … to

define custom audiences for ad targeting, [and] for Advantage+ catalog ads campaigns[.]"[58]

75.    Taking these one by one, "track[ing ] website visitors' actions[,] also known as

conversion tracking[,] ... can be used to analyze the effectiveness of [a] conversion funnel and to

calculate [] return[s] on ad investment[s]."[59]  Once a client is "tracking conversions, [Facebook]

recommend[s] that [the client] use them to … optimize [] ads for website conversions."[60]

76.    A "custom audience is an ad targeting option"[61] that can be used by advertisers, like

Defendant, "to find people most likely to respond to [their] ad[s]."[62]  Clients can "[c]reate [an]

online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their]

ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most

likely to take action.  Once [an] ad starts running, [Facebook's] system will learn who is engaging

with it and, over time, narrow [the] audience [to help] reach more of the right people."[63]

Advertisers can target, *inter alia*, "[n]ew customers with specific interests or from a specific

---

[56] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655.  *See also* FACEBOOK, STANDARD
EVENTS, https://developers.facebook.com/docs/meta-pixel/reference.

[57] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005; *see also* FACEBOOK, APP EVENTS
API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[58] FACEBOOK, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[59] FACEBOOK, CONVERSION TRACKING, https://developers.facebook.com/docs/meta-
pixel/implementation/conversion-tracking.

[60] *Id.*

[61] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/
help/744354708981227.

[62] FACEBOOK, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[63] *Id.*

---

location"; "[p]eople who have already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's] current customers."[64]

77.    "Advantage+ catalog ads are dynamically created by populating an ad template with product information found in a data feed. This allows [Facebook clients like Defendant] to create thousands of ads without having to configure each of them individually."[65]  Clients "can also use Advantage+ catalog ads to target visitors based on how they have interacted with [their] website in the past."[66]

78.    In short, Facebook states[67] that the Pixel can be used to:

- Make sure your ads are shown to the right people. Find new customers, or people who have visited a specific page or taken a desired action on your website.

- Drive more sales. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- Measure the results of your ads. Better understand the impact of your ads by measuring what happens when people see them.

79.    Gathered information is also used for analytics.  Namely, the Pixel helps "understand[] the actions people take on [a] website."[68]  "Examples of actions include adding an item to their shopping cart or making a purchase. The Pixel receives these actions, or events, which [] can [be] view[ed] on [the] Meta Pixel page in [the Facebook] Events Manager. From there, [a client will] be able to see the actions that [its] customers take."[69]  This allows Facebook clients to "segment

---

[64] Id.

[65] FACEBOOK, META PIXEL FOR ADVANTAGE+ CATALOG ADS, https://developers.facebook.com/docs/meta-pixel/get-started/advantage-catalog-ads.

[66] Id.

[67] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153.

[68] Id.

[69] Id.

[their] website visitors into groups based on the actions they have taken on [their] website."[70] Additionally, with the Pixel, clients can "[a]dd events on the pages that matter to [their] business to help [] understand [] customers' journey[s]. If [one were to] set up events along their path (for example, from product page views to a purchase) it may help [] measure and optimize [] ads for the conversions that mean the most to [one's] business."[71]

80.    Defendant uses the Pixel for such marketing, advertising, and analytics purposes. Defendant obtains revenue from the libraries it provides its catalog to.  Defendant knows that its ability to generate revenue depends in large part on the quality of its digital catalog content. Therefore, Defendant employs the Pixel to spy on users and intercept the communications of users viewing and obtaining reading material and video materials.  Defendant then gathers that information and catalogs it, creating an individualized profile of each user.

81.    Defendant analyzes large masses of this user profile information to locate trends and adjust its digital content accordingly.

## **CLASS ACTION ALLEGATIONS**

82.    Class Definition: Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and other similarly situated individuals defined as all persons in the state of California who United States who, during the class period, had their personally identifiable information or protected reading information disclosed to Facebook and other third party entities, as a result of using the Website (the "Class").

83.    Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

84.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

---

[70] FACEBOOK, CUSTOM AUDIENCES, https://developers.facebook.com/docs/meta-pixel/implementation/custom-audiences.

[71] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005.

85.     Excluded from the Class is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

86.     <u>Numerosity/Ascertainability</u>.  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class.  The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Facebook.

87.     <u>Typicality</u>.  Plaintiff's claims are typical of the claims of the Class because Plaintiff used the Website and, as a result of Defendant's unlawful conduct, had his personally identifiable information and video-viewing and private reading information intercepted by Facebook without his express written authorization or knowledge.  Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

88.     <u>Adequacy</u>.  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of data privacy litigation specifically.  Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

89.     <u>Common Questions of Law and Fact Predominate/Well Defined Community of Interest.</u>  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Class include:

(a)     Whether Defendant intentionally tapped the lines of internet communication between account holders and the Hoopla Service;

(b)     Whether the Website (including hoopladigital.com) contains code that permits third parties, such as Facebook, to intercept users' personally identifiable information, protected reading information, protected video-viewing information, and related communications;

(c)     Whether Facebook is a third-party eavesdropper;

(d)     Whether Defendant knowingly transmitted users' personally identifiable information and library use records to Facebook;

(e)     Whether Plaintiff's and Class Members' communications via the Website and the resultant interceptions thereof constitute an affirmative act of communication;

(f)     Whether Defendant's conduct, which allowed Facebook—an unauthorized person—to view Plaintiff's and Class Members' personally identifiable information and library materials search and borrowing record, resulted in a breach of confidentiality;

(g)     Whether Defendant violated Plaintiff's and Class Members' privacy rights by using third-party technology, such as the Facebook Pixel, to allow third parties to intercept users' online communications along with information that uniquely identified the individuals;

(h)     Whether Plaintiff and Class Members are entitled to damages under CIPA or any other relevant statute; and

(i)     Whether Defendant's actions violate Plaintiff's and Members of the Class' privacy rights as provided by the California Constitution.

90.     <u>Superiority</u>.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf Of The Class)**

91.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

92.     The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications."  Cal. Penal Code § 630.

93.     A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

Cal. Penal Code § 631(a).

94.     Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph.  *Id.*

95.     To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

96.     At all relevant times, Defendant aided, agreed with, and conspired with third parties,

including, Facebook, to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website.  These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

97.     Defendant, when aiding and assisting the wiretapping by Facebook, intended to help Facebook learn some meaning of the content in the URLs and the content the user viewed or requested.

98.     The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Pixel falls under the broad catch-all category of "any other manner":

a.     The computer codes and programs Facebook used to track Plaintiff and Class Members' communications while they were navigating the Website;

b.     Plaintiff's and Class Members' browsers;

c.     Plaintiff's and Class Members' computing and mobile devices;

d.     Facebook's web and ad servers;

e.     The web and ad-servers from which Facebook tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website;

f.     The computer codes and programs used by Facebook to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's Website; and

g.     The plan Facebook carried out to effectuate their tracking and interception of the Plaintiff's and Class Members' communications while they were using a web browser to visit Defendant's website.

99.     The library use records that Defendant permitted Facebook to intercept via the Website's integration of the Facebook Pixel, including users' history of borrowed and viewed reading and audiobook materials, constitutes protected information.

100.    As demonstrated above, Defendant violated the CIPA by aiding and permitting third parties to receive its users' online communications through the Website without their consent.

101.    As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

102.    Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf Of The Class)**

103.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

104.    Plaintiff brings this claim against Defendant individually and on behalf of the Class.

105.    CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

106.    Facebook's Business Tools, including but not limited to the Facebook Pixel, are "electronic amplifying or recording device[s]."

107.    Cal. Gov. Code § 7927.105 states that a "patron use record[]" includes both:

> (1) Any written or electronic record that is used to identify a library patron and is provided by the patron to become eligible to borrow or use books and other materials. This includes, but is not limited to, a patron's name, address, telephone number, or email address.

> And

(2) Any written record or electronic transaction that identifies a patron's borrowing information or use of library information resources. This includes, but is not limited to, database search records, borrowing records, class records, and any other personally identifiable uses of library resources, information requests, or inquiries.

108.    Cal. Civ. Code § 1798.90 states that "personal information" means:

(A) Any information that identifies, relates to, describes, or is associated with a particular user, including, but not limited to, the information specifically listed in Section 1798.80.

(B) A unique identifier or Internet Protocol address, when that identifier or address is used to identify, relate to, describe, or be associated with a particular user or book, in whole or in partial form.

(C) Any information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book, in whole or in partial form.

109.    Accordingly, any information that "is used to identify a library patron," "identifies, relates to, describes, or is associated with a particular user" of a book service, "identifies a patron's borrowing information or use of library information resources," constitutes a "unique identifier [that] … is used to identify, relate to, describe, or be associated with a particular user or book," or "relates to, or is capable of being associated with a particular user's access to or use of a book service or a book" qualifies as protected information under California law.  Plaintiff and Class Members accordingly had a privacy right to keep their library use records with the Hoopla Service confidential.

110.    Specifically, the following pieces of information provided by Plaintiff and Class Members to the Website constitute private, protected information: user's FIDs (and through them, their publicly available Facebook accounts), user's specific library search requests on the Hoopla Service, and user's borrowed library materials on the Hoopla Service.

111.    At all relevant times, Facebook intentionally used its Business Tools to eavesdrop upon and record the confidential communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other.

112.    When communicating with Defendant and using the Hoopla Service, Plaintiff and Class Members had an objectively reasonable expectation of privacy, based on Cal. Gov. Code § 7927.105 and Cal. Civ. Code § 1798.90.  Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Facebook, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

113.    Plaintiff and Class Members did not consent to any of Facebook's actions.  Nor have Plaintiff or Class Members consented to Facebook's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

114.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## COUNT III
### Invasion Of Privacy Under California's Constitution
### (On Behalf Of The Class)

115.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

116.    Plaintiff and Class Members have an interested in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff and Class Members' knowledge or consent.

117.    At all relevant times, by using the Facebook Pixel to record and communicate users' FIDs alongside their protected reading and video-viewing rental activity, Defendant intentionally invaded Plaintiff and Class Members' privacy rights under the California Constitution.

118.    Plaintiff and Class Members had a reasonable expectation that their communications, identity, video-viewing information, and reading information would remain confidential and that Defendant would not install wiretaps such as the Pixel on the Website.

119.    Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff and Class Members' protected reading and video-viewing history alongside their personally identifiable information to third parties such as Facebook.

120.    This invasion of privacy is serious in nature, scope, and impact because it relates to users' protected communications requesting or obtaining videos and reading materials.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

121.    Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    For a determination that this action is a proper class action;

b.    For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c.    For an order declaring that Defendant's conduct violates the statutes referenced herein;

d.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

e.    For an award of compensatory damages, including statutory damages where available, to Plaintiff and Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.    For punitive damages, as warranted, in an amount to be determined at trial;

g.    For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h.    For prejudgment interest on all amounts awarded;

i.    For injunctive relief as pleaded or as the Court may deem proper;

j.    For an order awarding Plaintiff and Class Members their reasonable attorneys' fees and expenses and costs of suit; and

k.      For an order granting Plaintiff and Class Members such further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: December 6, 2024                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:___*/s/ Philip Fraietta*_____
        Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7408
Facsimile:  (212) 989-9163
E-mail: pfraietta@bursor.com

*Attorney for Plaintiff and the Putative Class*