**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7408
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ehorne@bursor.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

KEVIN SMITH and LYLY TRAN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

MIDWEST TAPE, LLC d/b/a HOOPLA,

Defendant.

Case No. 3:24-cv-08805-JD

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

**PAGE(S)**

NATURE OF THE ACTION ..... 1
JURISDICTION AND VENUE ..... 1
THE PARTIES ..... 2
FACTUAL ALLEGATIONS ..... 5
I. OVERVIEW OF THE LAW ..... 5
A. California Information Privacy Act ..... 5
B. Cal. Civ. Code § 1799.3 ..... 7
C. California Patron Use Records Act ..... 7
D. California Reader Privacy Act ..... 8
II. OVERVIEW OF DEFENDANT'S DIGITAL LIBRARY SERVICE ..... 9
III. OVERVIEW OF THE THIRD PARTIES' TRACKING TECHNOLOGIES ..... 11
A. The Hoopla Service Integrated The Facebook Pixel ..... 11
B. The Hoopla Service Integrated Google Analytics ..... 17
IV. DEFENDANT KNOWINGLY ENABLES THE THIRD PARTIES TO INTERCEPT USERS' PROTECTED READING AND VIDEO-VIEWING INFORMATION ..... 20
A. Facebook ..... 20
B. Google Analytics ..... 27
C. IP Address ..... 30
V. DEFENDANT DISCLOSES USERS' PII AND BORROWING HISTORY FOR THE PURPOSES OF MARKETING, ADVERTISING, AND ANALYTICS ..... 30
CLASS ACTION ALLEGATIONS ..... 33
CLAIMS FOR RELIEF ..... 36
COUNT I ..... 36
COUNT II ..... 38
COUNT III ..... 41
COUNT IV ..... 42
DEMAND FOR JURY TRIAL ..... 43

Plaintiffs Kevin Smith and Lyly Tran ("Plaintiffs") file this first amended class action complaint on behalf of themselves and all others similarly situated (the "Class Members") against Defendant Midwest Tape, LLC d/b/a Hoopla ("Defendant" or "Hoopla"). Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This class action lawsuit is brought on behalf of all California residents who have accessed and used Defendant's web-based library service, hoopladigital.com (the "Website"), to search for, obtain, or otherwise access reading, audio-book, and video materials (the use of the Website known as the "Hoopla Service").

2. Defendant aids, employs, agrees, and conspires with Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"), and Google LLC ("Google" and together, the "Third Parties") to intercept communications sent and received by Plaintiffs and Class Members, including communications containing protected reading and video-viewing preferences. Plaintiffs bring this action for legal and equitable remedies resulting from these illegal actions. By failing to procure consent before enabling the Third Parties' interception of these communications, and by disclosing such information to the Third Parties, Defendant violated the California Information Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*, California Cal. Civ. Code § 1799.3, and the California Invasion of Privacy Act §§ 631-632.

## JURISDICTION AND VENUE

3. The Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the Class, and there is minimal diversity as the Plaintiffs reside in a different state than Defendant.

4. The Court has personal jurisdiction over Defendant because Defendant operates and does business in the State of California.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE PARTIES

***Plaintiffs***

6. ***Plaintiff Kevin Smith*** is a citizen of the state of California, over the age of 18, and lives in Oakland, California with an intent to remain there. Plaintiff Smith is therefore a resident of California.

7. Plaintiff Smith has used https://hoopladigital.com on a web browser to check out reading materials in connection with his San Francisco Public Library account since approximately March 2021. From approximately March 2021 through the present, Plaintiff Smith regularly accessed hoopladigital.com to search for and borrow books and audiobooks through his Hoopla account on a web browser.

8. When Plaintiff Smith used the Hoopla Service to search for or view reading materials, Defendant intercepted his communications with the Website that searched for or obtained books and audiobooks. Defendant then disclosed this information in conjunction with Plaintiff Smith's personally identifiable information to Facebook. Specifically, as a result of Defendant's unlawful conduct as alleged herein, Facebook helped Defendant intercept and collect information about Plaintiff Smith's search and borrowing history on the Website.

9. At all relevant times, Plaintiff Smith never consented to, agreed to, or otherwise permitted Defendant to disclose his personally identifiable information and the record of materials that Plaintiff searched for, viewed, and obtained on the Hoopla Service to third parties, including to Facebook.

10. Likewise, Defendant never gave Plaintiff Smith the opportunity to prevent the disclosure of his personally identifiable information and the record of materials that Plaintiff searched for, viewed, and obtained on the Hoopla Service to Facebook.

11. Plaintiff Smith has an active Facebook account which he has maintained for over ten years. During that time, Plaintiff Smith has routinely logged onto his Facebook account on the same web browser he used to access Defendant's Website.

12. Pursuant to the systematic process described herein, Defendant assisted Facebook with intercepting Plaintiff Smith's protected communications on the Website without his consent, including those that contained personally identifiable information, reading preferences, and video-viewing preferences.

13. Plaintiff Smith also has an active Gmail account which he has maintained for over five years. During that time, Plaintiff Smith has routinely logged onto his Gmail account on the same web browser he used to access Defendant's Website.

14. Pursuant to the systematic process described herein, Defendant assisted Google with intercepting Plaintiff Smith's protected communications on the Website without his consent, including those that contained personally identifiable information and reading preferences.

15. By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff Smith's personally identifiable information and protected reading and video-viewing preferences to Facebook and Google.

16. ***Plaintiff Lyly Tran*** is a citizen of the state of California, over the age of 18, and lives in Fountain Valley, California with an intent to remain there. Plaintiff is therefore a resident of California.

17. Plaintiff Tran has used https://hoopladigital.com on a web browser to check out reading and video materials in connection with her Los Angeles Public Library account since approximately 2020. From approximately 2020 through the present, Plaintiff Tran regularly accessed hoopladigital.com to search for and borrow reading and video materials through her Hoopla account on a web browser in addition to on the Hoopla mobile application.

18. When Plaintiff Tran used the Hoopla Service to search for or view reading and video materials, Defendant intercepted her communications with the Website that searched for or obtained books and audiobooks. Defendant then disclosed this information in conjunction with

Plaintiff Tran's personally identifiable information to Facebook. Specifically, as a result of Defendant's unlawful conduct as alleged herein, Facebook helped Defendant intercept and collect information about Plaintiff Tran's search and borrow history on the Website.

19. At all relevant times, Plaintiff Tran never consented to, agreed to, or otherwise permitted Defendant to disclose her personally identifiable information and the record of materials that Plaintiff Tran searched for, viewed, and obtained on the Hoopla Service to third parties, including to Facebook and Google.

20. Likewise, Defendant never gave Plaintiff Tran the opportunity to prevent the disclosure of her personally identifiable information and the record of materials that Plaintiff searched for, viewed, and obtained on the Hoopla Service to Facebook and Google.

21. Plaintiff Tran has an active Facebook account which she has maintained for over ten years. During that time, Plaintiff has routinely logged onto her Facebook account on the same web browser she used to access Defendant's Website.

22. Pursuant to the systematic process described herein, Defendant assisted Facebook with intercepting Plaintiff Tran's protected communications on the Website without her consent, including those that contained personally identifiable information, reading preferences, and video-viewing preferences.

23. Plaintiff Tran also has an active Gmail account which she has maintained for over ten years. During that time, Plaintiff Tran has routinely logged onto her Gmail account on the same web browser she used to access Defendant's Website.

24. Pursuant to the systematic process described herein, Defendant assisted Google with intercepting Plaintiff Tran's protected communications on the Website without her consent, including those that contained personally identifiable information, reading preferences, and video-viewing preferences.

25. By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff Tran's personally identifiable information and protected reading and video-viewing preferences to Facebook and Google.

***Defendant***

26. Midwest Tape, LLC is incorporated in the State of Ohio and has its principal place of business in Holland, Ohio. Hoopla is a "groundbreaking digital media service that allows" account holders to "borrow movies, music, audiobooks, ebooks, comics[,] and TV shows to enjoy on their computer, tablet, or phone – even their TV!"[1] Defendant owns and operates the digital library rental catalog and the digital distribution service that partners with libraries nationwide, found at hoopladigital.com (the "Website").

## FACTUAL ALLEGATIONS

## I. OVERVIEW OF THE LAW

### A. California Information Privacy Act

27. The California Information Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

28. To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire,

[1] HOOPLA, MIDWEST TAPE, https://www.midwesttape.com/hoopla.

> line or cable or is being sent from or received at any place within this state,
>
> Or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

29. Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

30. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

31. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

32. Individuals may bring an action against the violator of CIPA §§ 631 and 632. Under Cal. Penal Code § 637.2, Plaintiffs and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**B. Cal. Civ. Code § 1799.3**

33. The California Legislature passed Cal. Civ. Code § 1799.3 into law to restrict the disclosure of video sale or rental records and protect California users' privacy. 1988 Cal. Legis. Serv. 1050 (West) ("Existing law does not generally restrict the disclosure by persons providing video cassette sales or rental services of records prepared or maintained by those persons, although the California Constitution specifies privacy as one of the inalienable rights of all people in the state.").[2]

34. In an effort to preserve Californians' right to privacy, Section 1799.3(a) provides that "[n]o person providing video recording sales or rental services shall disclose any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

35. Section 1799.3 contains an exception for "the disclosure of names and addresses only for commercial purposes." Cal. Civ. Code § 1799.3(6).

**C. California Patron Use Records Act**

36. The California Legislature enacted the Patron Use Records Act to protect certain privacy rights of California citizens accessing library services.

37. The California Patron Use Records Act, Cal. Gov. Code § 7927.105, prohibits the unauthorized disclosures of information that identifies a library patron's "borrowing information or use of library information resources" and "[a]ny written or electronic record that is used to identify a library patron." Ca. Gov. Code § 7929.105(a). The prohibited records that could be used to identify a patron "include[], but is not limited to, a patron's name, address, telephone number, or email address." *Id.* at (a)(1). And the prohibited records that identify a person's borrowing information or use of library resources "includes, but is not limited to, database search records, borrowing records, class records, and any other personally identifiable uses of library resources, information requests, or inquiries." *Id.* at (a)(2).

---

[2] Cal. Civ. Code § 1799.3 was amended in 2009 to change "video cassettes" to "video recording."

38. The statute prohibits disclosure of such information "to any person, local agency, or state agency," except for use in library administrative duties, with the patron's authorization in writing, or by court order," and creates a privacy interest for Californian library patrons in their personally identifiable information and their borrowing information and library resource usage. *Id.* at (c).

39. As can be seen from the enaction of this statute, California has a strong expressed legislative intent to protect the privacy rights of individuals' reading materials and uses of research materials—going to lengths to ban disclosures of which individual searched for or obtained which library materials and library resource information.

**D. California Reader Privacy Act**

40. The California Reader Privacy Act, Cal. Civ. Code § 1798.90, was enacted to further prevent providers of book services from disclosing or being compelled to disclose "any personal information relating to a user of the book service." Legislative Counsel's Digest to Cal. Civ. Code § 1798.90. The statute prohibits "commercial entit[ies] offering … book service[s] to the public" from "knowingly disclos[ing] to any government entity," or being "compelled to disclose to any person[] [or] private entity" a user's "personal information."

41. A "[b]ook service" is defined as a service that primarily "provides the rental, purchase, borrowing, browsing, or viewing of books."[3] Cal. Civ. Code § 1798.90(b)(2). Defendant's Hoopla Service constitutes a book service here.

42. "Personal information" is defined as:

> (A) Any information that identifies, relates to, describes, or is associated with a particular user, including, but not limited to, the information specifically listed in Section 1798.80.
>
> (B) A unique identifier or Internet Protocol address, when that identifier or address is used to identify, relate to, describe, or be associated with a particular user or book, in whole or in partial form.

---

[3] The statute explicitly carves out stores that sell "a variety of consumer products" with book service sales "do not exceed 2 percent of the store's total annual gross sales of consumer products sold in the United States," which is not applicable to Defendant here. Cal. Civ. Code § 1798.90(b)(2).

> (C) Any information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book, in whole or in partial form.

Cal. Civ. Code § 1798.90(b)(2).

43. While this statute focuses on prohibiting disclosures of personal information to government entities, the explicit ban on disclosing "personal information relating to a user of [a] book service" further demonstrates California's strong intent in protecting the private reading and book-browsing history of its residents.

## II. OVERVIEW OF DEFENDANT'S DIGITAL LIBRARY SERVICE

44. Midwest Tape "is a full-service media distributor offering a wide variety of … shelf-ready content[] and customized services for" libraries.[4] Account holders can access the video, reading, and audio content in Defendant's catalog through Defendant's digital media distribution service, hoopla Digital.[5] Hoopla Digital "partners with libraries around the United States to allow an account holder to "[i]nstantly borrow digital movies, music, ebooks, and more, 24/7 with [their] library card."[6]

45. Notably, through the Hoopla Service, account holders can "stream[] … hundreds of thousands of titles … with more being added daily."[7] Through the Website, Defendant's Hoopla Service allows "people to read, listen, and watch what they want, when they want, and where they want," so long as they have a valid library card.[8] In sum, creating an account and using Defendant's Hoopla Service "is like having your public library at your fingertips – anytime, anywhere!"[9]

46. Defendant owns and operates the Website, which provides the Hoopla Service and distributes digital reading and video materials to account holders across the entire United States.

---

[4] TIME-SAVING LIBRARY SERVICES, MIDWEST TAPE, https://www.midwesttape.com/services.

[5] STORY, MIDWEST TAPE, https://www.midwesttape.com/story.

[6] HOOPLA, MIDWEST TAPE, https://www.midwesttape.com/hoopla.

[7] *Id.*

[8] STORY, MIDWEST TAPE, https://www.midwesttape.com/story.

[9] *Id.*

Specifically, the Hoopla Service partners with libraries throughout the entire United States to distribute Defendant's digital catalog of materials directly to users who have created Hoopla accounts.[10]

47. Account holders can access content on the Hoopla Service so long as their public library has partnered with Hoopla. As of 2022, Hoopla Digital had partnered with more than 8,500 public libraries across the U.S., Canada, Australia, and New Zealand.[11]

48. Account creation is free, but users must provide their valid library card information and email address to Defendant in the signup process.

49. To access the Hoopla Service, users must be patrons of a library that partners with Hoopla.[12] "Hoopla is a free service provided to library patrons by participating libraries."[13]

50. Relevant to the proposed Class, to be a patron of a California library that partners with Hoopla, users must reside within the state of California. Plaintiff Kevin Smith is a patron of the San Francisco Public Library, whose website states that library cards are only available to California state residents;[14] and Plaintiff Lyly Tran is a patron of the Los Angeles Public Library, whose website states that library cards are only available to California state residents.[15]

51. Therefore, Plaintiffs and Class Members reside in California and are patrons of California libraries that partner with Hoopla—and Plaintiffs and Class Members accessed the Hoopla Service while located in California. Indeed, Plaintiffs and Class Members would be unable to access the Hoopla Service and obtain library cards from Hoopla partner libraries located outside of California if Plaintiffs and Class Members maintained their residency in California.

---

[10] *See* REGISTER, MIDWEST TAPE, https://www.midwesttape.com/Register ("Access to our web site is granted only to individuals affiliated with a library.").

[11] *See hoopla digital Expands BingePass Offering with Addition of Curiosity Stream*, PR NEWSWIRE (Jan. 24, 2022 at 5:17pm), https://www.prnewswire.com/news-releases/hoopla-digital-expands-bingepass-offering-with-addition-of-curiosity-stream-301466779.html.

[12] ABOUT, MIDWEST TAPE, https://library.hoopladigital.com/about/.

[13] FAQ, MIDWEST TAPE, https://www.hoopladigital.com/faq.

[14] *See* FAQ, SAN FRANCISCO PUBLIC LIBRARY, https://sfpl.libanswers.com/faq/129952.

[15] *See* BORROWER SERVICES, LOS ANGELES PUBLIC LIBRARY, https://lapl.org/about-lapl/borrower-services#apply.

## III. OVERVIEW OF THE THIRD PARTIES' TRACKING TECHNOLOGIES

52. Meta and Google wiretap the Website with their respective tracking technologies, which Defendant purposefully installed on the Website.

53. The Third Parties' tracking technologies send secret instructions to a Website user's browser, without alerting the individual that this is happening. The trackers then cause the browser to secretly and simultaneously duplicate the user's Website communications, transmitting these communications to the Third Parties' servers alongside additional information about the Website user's identity. This entire process occurs within milliseconds. In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to the Third Parties at the same time as they are being sent to Defendant. Thus, the Third Parties' interception of these communications occurs "in transit." *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.,* 701 F. Supp. 3d 942, 962 (N.D. Cal. 2023), *motion to certify appeal denied*, 2024 WL 664811 (N.D. Cal. Feb. 16, 2024) (finding in-transit interception was alleged based on similar process to the one alleged herein).

### A. The Hoopla Service Integrated The Facebook Pixel

54. Per Plaintiffs' counsel's investigation, Defendant's integration of the Facebook Tracking Pixel ("Facebook Pixel" or "Pixel") enables Facebook to intercept the communications of individual users with the Website, including but not limited to users' personally identifiable information in the form of their Facebook ID and the full title of the materials that users search for or borrow on the Hoopla Service.

55. Per a research paper presented at the Association for Computing Machinery Web Conference 2023, "[a tracking pixel] is a piece of JavaScript code added to a website as a graphic

element[, ] 1 × 1 pixel [in size,] that is loaded when a user lands on the website hosting it."[16] "When a user visits a [tracking pixel]-enabled website, an instance of the [tracking] pixel loads in the HTML code of the page on the browser."[17] "[I]f a corresponding … cookie does not exist on the browser, one is created and a unique ID is saved[.]"[18] Then, the tracking pixel's "embedded [] URL point[s] to [a third party's (i.e., Facebook)] servers[] … [and] report[s] to [the third party (i.e., Facebook)] the user['s] activity for the duration of the visit[,]" along "with [the] specific ID reflecting the specific [website user. This] can be used [] to track [] audiences for brand ads[.]"[19]

56. To implement a tracking pixel, a website administrator simply places on their website "[t]he [b]ase [tracking p]ixel code[, which] is a small segment of JavaScript code [that] acts as an 'initiator' for the [tracking p]ixel['s] behavior."[20] Once active, this code will load "a library of functions [(i.e., fbevents.js for the Pixel] … on the website[.] … This library is the core mechanism[s] of the FB Pixel."[21] In addition, "the webpage administrator [] define[s] … the behavior they wish to track and report to [Facebook], by defining *events*, i.e., actions, that a user takes on the website."[22] When in use, the tracking pixels then "reports to [Facebook] information about [each] event and [the] user that caused it," for Facebook's "future use in ad-conversion and further user profiling and tracking[.]"[23]

57. Defendant discloses users' personally identifying information and the information they viewed or obtained on the Hoopla Service to Facebook so that it can obtain the marketing, advertising, and analytics technological tools that Facebook provides. Facebook describes itself as

---

[16] Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with Invisible Pixels and Click IDs*, ARXIV (Apr. 2023) at 2, https://arxiv.org/pdf/2208.00710.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

a "real identity platform,"[24] meaning users are allowed only one account and must share "the name they go by in everyday life."[25] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[26]

58. In 2021, Facebook generated $117 billion in revenue.[27] With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space.[28]

59. Facebook sells advertising space by highlighting its ability to target users.[29] Facebook can target users so effectively because it surveils user activity both on and off its site.[30] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[31] Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[32]

60. Advertisers can also build "Custom Audiences."[33] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're

---

[24] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[25] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[26] FACEBOOK, SIGN UP, https://www.facebook.com/.

[27] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[28] *Id.*at 63.

[29] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[30] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[31] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[32] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[33] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

loyal customers or people who have used [their] app or visited [their] website."[34] With Custom Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[35] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[36]

61. As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[37] Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

62. The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[38] Facebook's Business Tools can also track other events. Facebook offers a menu of "standard events" from which advertisers can

---

[34] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[35] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[36] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[37] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[38] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

choose, including what content a visitor views or purchases.[39] Advertisers can even create their own tracking parameters by building a "custom event."[40]

63. One such Business Tool is the Facebook Pixel (the "Facebook Pixel"). Facebook offers this piece of code to advertisers, like Defendant, to integrate into its website. The Facebook Pixel "tracks the people and type of actions they take."[41] When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers. This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. At relevant times, two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code, and Facebook's embedded code.

64. Defendant chose to include the Facebook Pixel on its Website.

65. Facebook's own documentation makes clear just how much tracking of private information the Facebook Pixel does. It describes the Facebook Pixel as code that Facebook's business customers can put on their website to "[m]ake sure your ads are shown to the right people. ***Find … people who have visited a specific page or taken a desired action on your website***."[42]

66. Facebook instructs such business customers that:

> Once you've set up the [Facebook Tracking] Pixel, ***the pixel will log when someone takes an action on your website***. Examples of actions include adding an item to their shopping cart or making a purchase. ***The Pixel receives these actions, or events***, which you can view on your [Facebook Tracking] Pixel page in Events

[39] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[40] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[41] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[42] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (emphasis added).

> Manager. From there, you'll be able to see the actions that your customers take. ***You'll also have options to reach those customers again through future Meta ads***.[43]

67. The Facebook Pixel code enables Facebook not only to help Defendant with advertising to its own users outside the Website, but also include individual users among groups targeted by ***other*** Facebook advertisers relating to the conditions about which users communicated on Defendant's Website.

68. Facebook's Business Help Center explains:

> Meta ***uses marketing data to show ads to people who are likely to be interested in them***. One type of marketing data is website events, which are ***actions that people take on your website***.[44]

69. In other words, Facebook sells advertising space by highlighting its ability to target users.[45] Facebook can target users so effectively because it surveils user activity both on and off its site.[46] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and connections.[47]

70. An example illustrates how the Facebook Pixel works. Take an individual who navigates to Defendant's Website and searches a particular author or video title. When that search button is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because the Hoopla Service integrated and utilizes the Facebook Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Facebook causes the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's

---

[43] *Id.* (emphasis added).

[44] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

[45] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[46] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[47] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

servers, alongside additional information that transcribes the communication's content and the individual's identity.

71. After collecting and intercepting the information described in the preceding paragraph, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

### B. The Hoopla Service Integrated Google Analytics

72. Per Plaintiffs' counsel's investigation, Defendant integrates the Google Analytics Tag ("Google Analytics Tag" or "Tag") onto the Website, a piece of code that tracks users' actions and identities on the Website. This enables Google to intercept the contents of individual users' communications with the Website, including but not limited to their personally identifying information and the full titles of the book and audio-visual materials that users search for, view, and borrow from the Website.

73. Google wiretaps the Website with trackers associated with "Google Analytics."[48] According to Google, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[49] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site."[50] Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page."[51] Specifically, Google Analytics tracks "events"; "sessions"; and "users[.]"[52]

74. "Events let [clients] measure … when someone loads a page, clicks a link, [] makes a purchase[]" and more.[53] Google provides a menu of "recommended events" (i.e., "completes a

---

[48] GOOGLE, START LEARNING ABOUT GOOGLE ANALYTICS, https://developers.google.com/analytics.

[49] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447.

[50] *Id.*

[51] *Id.*

[52] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[53] GOOGLE, SET UP EVENTS, https://developers.google.com/analytics/devguides/collection/ga4/events.

purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; "views their shopping cart")[54] and also allows for "collect[ing] additional information that Google Analytics does not collect automatically[,]" through "custom events."[55]

75. A "session" is "the period from when a user visits [a] website or app to when they leave [said] website or app[.][56] "When a session starts, Google automatically collects a session_start event and generates a session ID (ga_session_id) and session number (ga_session_number)[.]"[57]

76. Finally, to discern when "two different [users] interact with [a] website[,] … Google Analytics identifies an individual user based on [Google Analytics] reporting identit[ies.]"[58] Reporting identities are combinations of "identifiers … called *identity spaces*"—namely, "User-ID"; "user-provided data"; "device ID"; and "modeling[.]"[59]

- A "User-ID" is a "persistent ID[,]"[60] consisting of a unique combination of up to "256 characters[,]"that is created by website operators and "assign[ed] and consistently reassign[ed] … to [] users[,] … typically [] during login."[61]

- "User-provided data" consists of contact details such as "email, phone, name and address[,]" provided by website users, that "is [] matched with other Google data … to improve the accuracy of [] measurement data and power enhanced Analytics capabilities."[62] Although these personal details are "hashed,"[63] the reality is that, even in hashed form, they are traceable to individuals.[64]

---

[54] GOOGLE, [GA4] RECOMMENDED EVENTS, https://support.google.com/analytics/answer/9267735.

[55] GOOGLE, [GA4] CUSTOM EVENTS, https://support.google.com/analytics/answer/12229021.

[56] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[57] GOOGLE, [GA4] ABOUT ANALYTICS SESSIONS, https://support.google.com/analytics/answer/9191807.

[58] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[59] GOOGLE, [GA4] REPORTING IDENTITIES, https://support.google.com/analytics/answer/10976610.

[60] *Id.*

[61] GOOGLE, [GA4] MEASURE ACTIVITY ACROSS PLATFORMS WITH USER-ID, https://support.google.com/analytics/answer/9213390.

[62] GOOGLE, [GA4] USER-PROVIDED DATA COLLECTION, https://support.google.com/analytics/answer/14077171.

[63] *Id.*

[64] *See, e.g.*, FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong.");

- A "device ID" is a "browser-based or mobile-app-based identifier[.]"[65] "On a website, device ID gets its value from the client ID property of the _ga cookie. In an iOS or Firebase app, device ID gets its value from the app-instance ID, which identifies a unique installation of the app."[66]

- "Modeling" uses "machine learning to model the behavior of users who decline analytics cookies based on the behavior of similar users who accept analytics cookies."[67]

77. Google Analytics can also leverage "Google signals," which "associates [data] with user[s'] … Google accounts," for "users who have signed in … and who have turned on Ads Personalization."[68] "This association of data with these signed-in users is used to enable cross-device remarketing, and cross-device key events export to Google Ads."[69]

---

FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); STEVEN ENGLEHARDT ET AL., I NEVER SIGNED UP FOR THIS! PRIVACY IMPLICATIONS OF EMAIL TRACKING, https://petsymposium.org/2018/files/papers/issue1/paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy protection. This is folk knowledge in the security community, but bears repeating."); MARTECH, FTC PRIVACYCON: YOUR EMAIL ADDRESS IS LEAKING AND VULNERABLE, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

[65] GOOGLE, [GA4] DEVICE ID, https://support.google.com/analytics/answer/9356035.

[66] *Id.*

[67] GOOGLE, [GA4] BEHAVIORAL MODELING FOR CONSENT MODE, https://support.google.com/analytics/answer/11161109.

[68] GOOGLE, [GA4] ACTIVATE GOOGLE SIGNALS FOR GOOGLE ANALYTICS PROPERTIES, https://support.google.com/analytics/answer/9445345.

[69] *Id.*

## IV. DEFENDANT KNOWINGLY ENABLES THE THIRD PARTIES TO INTERCEPT USERS' PROTECTED READING AND VIDEO-VIEWING INFORMATION

### A. Facebook

78. Through the Pixel, Defendant enables Facebook to intercept the identities and online rental activity of Defendant's users on the Hoopla Service, including information relating to the videos that users searched for and borrowed, and the books and videos that users borrowed.




79. When a user searches the Hoopla Service, the Pixel intercepts the exact keywords that the user searches for. This means that if a user searches for the title of a book, audiobook, or video, Facebook intercepts the contents of those communications with the Hoopla Service. For example, the following image depicts a user searching the Hoopla Service for "Tolkien":

80. At the same time, Defendant sends to Facebook the following network transmission:




81. In the URL of the request, red squares highlight that the individual user (i) viewed a page (denoted by the "ev=PageView"); (ii) that was viewed on the Hoopla Service located at www.hoopladigital.com; (iii) conducted a search of the catalog (denoted by the word "search"); and (iv) specifically, this user searched for "Tolkien" (denoted by the word "Tolkien").

82. In that same network transmission, Facebook intercepts precisely who the individual user searching for "Tolkien" is. Defendant does this by disclosing an individual user's "c_user cookie," a unique identifier associated with a single Facebook user's Facebook profile ("Facebook ID" or "FID"). The cookie is a string of numbers that is unique to every Facebook account—distinguishing each FID from its peers.

83. Any person, even those without in-depth technical expertise, can utilize the FID to identify owners of the FID via their Facebook profile. Once the Pixel's routine exchange of information is complete, the FID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook FID to www.facebook.com (www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the individual FID's profile page, including all the information contained in or associated with the profile page, for the user associated with the particular FID.

84. A user who accesses Defendant's Website while logged into Facebook will have their communications with the Website intercepted and have their c_user cookie transmitted to Facebook. This cookie contains that user's unencrypted Facebook ID.

85. Due to the integration of the Facebook Pixel on the Website, Facebook is able to intercept the information about the Website page the user viewed. This information includes the specific audio visual and/or reading materials the user searched for or borrowed, all of which is included in the URL. When Facebook intercepts this communication due to Defendant's integration of the Facebook Pixel, Facebook effectively intercepts the exact video and/or reading material(s) the individual is viewing or searching for.

86. Notably, Defendant even sends to Facebook, through the Pixel, whether the user borrowed materials or played a video. The following screenshot of the network traffic shows Defendant disclosing to Facebook personal information of a user who borrowed an audiobook version of J.R.R. Tolkien's *The Hobbit*:

▼ Request Headers

| | |
|---|---|
| :authority: | www.facebook.com |
| :method: | GET |
| :path: | /tr/?id=1061059240696657&ev=SubscribedButtonClick&dl=https%3A%2F%2Fwww.hoopladigital.com%2Faudiobook%2Fthe-hobbit-jrr-tolkien%2F13496436&rl=&if=false&ts=1733279659910&cd[buttonFeatures]=%7B%22classList%22%3A%22inline-block%20rounded-md%20disabled%3Acursor-not-allowed%20transition-colors%20py-3%20px-8%20h-auto%20w-auto%20leading-none%20disabled%3Aopacity-50%20text-xs%20tracking-wider%20text-center%20uppercase%20font-semibold%20bg-hoopla-blue%20hover%3Abg-hoopla-blue-dark%20focus%3Abg-hoopla-blue-dark%20text-white%20hover%3Atext-white%20focus%3Atext-white%22%2C%22destination%22%3A%22%22%2C%22id%22%3A%22%22%2C%22imageUrl%22%3A%22%22%2C%22innerText%22%3A%22BORROW%20TITLE%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%22button%22%2C%22type%22%3A%22button%22%2C%22name%22%3A%22%22%2C%22value%22%3A%22%22%7D&cd[buttonText]=BORROW%20TITLE&cd[formFeatures]=%5B%5D&cd[pageFeatures]=%7B%22title%22%3A%22The%20Hobbit%20Audiobook%20by%20J.R.R.%20Tolkien%20%7C%20hoopla%22%7D&cd[parameters]=%5B%5D&sw=1920&sh=1080&v=2.9.176&r=stable&ec=23&o=4126&fbp=fb.1.1733256646944.564451498587084425&cs_est=true&ler=empty&cdl=API_unavailable&it=1733256646918&coo=false&es=automatic&tm=3&rqm=GET |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br, zstd |
| Accept-Language: | en-US,en;q=0.9 |
| Cookie: | datr=5mxPZ4PWzI7ENyEaQeAnWxhj; sb=5mxPZ9H4Uw-a_jHhasgdQGD-; usida=eyJ2ZXIiOjEsImlkIjoiQXNueTYyajU3dnE0ZyIsInRpbWUiOjE3MzMyNzgyNjd9; c_user=61557047663647; xs=37%3AgMsuwUKTu94tlg%3A2%3A1733278343%3A-1%3A-1; fr=0wDHr22hHZuMMfRGx.AWVE36G_0qwtF1c1nVRqQr-SRPM.BnT2zm..AAA.0.0.BnT7ql.AWU-8DHMeCQ; ar_debug=1 |

87. And the following screenshot shows Defendant disclosing to Facebook the same user’s personal information and the fact that the user played the audiobook:

//

//

//

//

//

//

//

//

```
▼ Request Headers
:authority:        www.facebook.com
:method:           GET
:path:             /tr/?
                   id=1061059240696657&ev=SubscribedButtonClick&dl=https%3A%2F%2
                   Fwww.hoopladigital.com%2Faudiobook%2Fthe-hobbit-jrr-
                   tolkien%2F13496436&rl=&if=false&ts=1733503697609&cd[buttonFeatur
                   es]=%7B%22classList%22%3A%22inline-block%20rounded-
                   md%20disabled%3Acursor-not-allowed%20transition-colors%20py-
                   3%20px-8%20h-auto%20w-auto%20leading-
                   none%20disabled%3Aopacity-50%20text-xs%20tracking-wider%20text-
                   center%20uppercase%20font-semibold%20bg-hoopla-
                   blue%20hover%3Abg-hoopla-blue-dark%20focus%3Abg-hoopla-blue-
                   dark%20text-white%20hover%3Atext-white%20focus%3Atext-
                   white%20w-
                   full%22%2C%22destination%22%3A%22%22%2C%22id%22%3A%22play-
                   button%22%2C%22imageUrl%22%3A%22%22%2C%22innerText%22%3A
                   %22PLAY%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%2
                   2button%22%2C%22type%22%3A%22button%22%2C%22name%22%3A
                   %22%22%2C%22value%22%3A%22%22%7D&cd[buttonText]=PLAY&cd[f
                   ormFeatures]=%5B%5D&cd[pageFeatures]=%7B%22title%22%3A%22The
                   %20Hobbit%20Audiobook%20by%20J.R.R.%20Tolkien%20%7C%20hoopl
                   a%22%7D&cd[parameters]=%5B%5D&sw=1920&sh=1080&v=2.9.178&r
                   =stable&ec=10&o=4126&fbp=fb.1.1733256646944.56445149858708442
                   5&cs_est=true&ler=empty&cdl=API_unavailable&it=1733503582573&co
                   o=false&es=automatic&tm=3&rqm=GET
:scheme:           https
Accept:            image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
Accept-Encoding:   gzip, deflate, br, zstd
Accept-Language:   en-US,en;q=0.9
Cookie:            datr=5mxPZ4PWzI7ENyEaQeAnWxhj; sb=5mxPZ9H4Uw-a_jHhasgdQGD-;
                   usida=eyJ2ZXIiOjEsImlkIjoiQXNueTYyajU3dnE0ZyIsInRpbWUiOjE3MzMyN
                   zgyNjd9; ar_debug=1; ps_n=1; c_user=61557047663647;
                   xs=4%3AT8XSm5VUf9iZPQ%3A2%3A1733503673%3A-1%3A-1;
                   fr=1HD0UYExEhfZLcOJv.AWXH69pUe_UWI_E5XWKczSX-
                   GSE.BnT82-..AAA.0.0.BnUyq8.AWXICTkfqFc
```


88. Further, Facebook also intercepts the contents of a user's communications when a user views and borrows videos on the Hoopla Service. The following screenshot shows Defendant disclosing to Facebook a user's personally identifiable information and the fact that they viewed and played the movie *Wicked, The Real Story*, produced by Stephen Schwartz on the Hoopla Service:

//

//

//

//

//

//

//

```
▼ Request Headers
:authority:        www.facebook.com
:method:           GET
:path:             /tr/?
                   id=1061059240696657&ev=SubscribedButtonClick&dl=https%3A
                   %2F%2Fwww.hoopladigital.com%2Fmovie%2Fwicked-the-real-
                   story-stephen-
                   schwartz%2F17445167&rl=&if=false&ts=1733281145995&cd[but
                   tonFeatures]=%7B%22classList%22%3A%22inline-
                   block%20rounded-md%20disabled%3Acursor-not-
                   allowed%20transition-colors%20py-3%20px-8%20h-auto%20w-
                   auto%20leading-none%20disabled%3Aopacity-50%20text-
                   xs%20tracking-wider%20text-center%20uppercase%20font-
                   semibold%20bg-hoopla-blue%20hover%3Abg-hoopla-blue-
                   dark%20focus%3Abg-hoopla-blue-dark%20text-
                   white%20hover%3Atext-white%20focus%3Atext-white%20w-
                   full%22%2C%22destination%22%3A%22%22%2C%22id%22%3A%
                   22play-
                   button%22%2C%22imageUrl%22%3A%22%22%2C%22innerText%
                   22%3A%22PLAY%22%2C%22numChildButtons%22%3A0%2C%22t
                   ag%22%3A%22button%22%2C%22type%22%3A%22button%22%
                   2C%22name%22%3A%22%22%2C%22value%22%3A%22%22%7D
                   &cd[buttonText]=PLAY&cd[formFeatures]=%5B%5D&cd[pageFeat
                   ures]=%7B%22title%22%3A%22Wicked%3A%20The%20Real%20S
                   tory%20(2024)%20Movie%20%7C%20hoopla%22%7D&cd[parame
                   ters]=%5B%5D&sw=1920&sh=1080&v=2.9.176&r=stable&ec=54
                   &o=4126&fbp=fb.1.1733256646944.564451498587084425&cs_es
                   t=true&ler=empty&cdl=API_unavailable&it=1733256646918&co
                   o=false&es=automatic&tm=3&rqm=GET
:scheme:           https
Accept:            image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q
                   =0.8
Accept-Encoding:   gzip, deflate, br, zstd
Accept-Language:   en-US,en;q=0.9
Cookie:            datr=5mxPZ4PWzI7ENyEaQeAnWxhj; sb=5mxPZ9H4Uw-
                   a_jHhasgdQGD-;
                   usida=eyJ2ZXIiOiFsImlkIjoiQXNueTYvaiU3dnE0ZyIsInRpbWUiOjE3
                   MzMyNzgyNjd9; c_user=61557047663647;
                   xs=37%3AgMsuwUKTu94tlg%3A2%3A1733278343%3A-1%3A-1;
```


89. When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

90. One such cookie is the "fr cookie" which contains, at least, an encrypted Facebook ID and browser identifier.[70] Facebook, at a minimum, uses the fr cookie to identify users. [71]

91. If a visitor has never created an account, an even smaller set of cookies are transmitted.

[70] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[71] FACEBOOK, PRIVACY CENTER–COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

92. At each stage, Defendant also utilizes the "_fbp cookie", which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user. [72]

93. The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[73] Otherwise, the c_user cookie is cleared when the browser exits.[74]

94. The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[75] If that happens, the time resets, and another 90 days begins to accrue.[76]

95. The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[77] If that happens, the time resets, and another 90 days begins to accrue.[78]

96. The Facebook Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website.[79] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[80] The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

97. Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook

---

[72] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[73] Seralahthan, *Facebook Cookies Analysis*, TECH EXPERTISE (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[74] *Id.*

[75] *See id.*

[76] FACEBOOK, PRIVACY CENTER, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 ("For example, the "fr" cookie is used to deliver, measure and improve the relevancy of ads, with a lifespan of 90 days.").

[77] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[78] *See* FACEBOOK, CLICKID AND THE FBP AND FBC PARAMETERS, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.

[79] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[80] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

IDs and corresponding Facebook profiles. Facebook intercepts these identifiers alongside the event data of each user.

**B. Google Analytics**

98. Through the Tag, Defendant enables Google to intercept the identities and online rental activity of Defendant's users on the Hoopla Service, including information relating to the videos that users searched for and borrowed, and the books and videos that users borrowed.

99. When a user searches the Hoopla Service, the Tag intercepts the exact keywords that the user searches for. This means that if a user searches for the title of a book, audiobook, or video, Google receives the contents of those communications with the Hoopla Service. For example, the following image depicts a user searching the Hoopla Service for "lord of the rings":

```
dl: https://www.hoopladigital.com/search?q=lord+of+the+rings&scope=everything&type=direct
```

```
dt: Search lord of the rings | hoopla
en: page_view
```

100. The Tag also intercepts when a user views any materials on the Hoopla Service. The following screenshot shows a user viewing J.R.R. Tolkien's *The Return of the King*:

```
dl: https://www.hoopladigital.com/ebook/the-return-of-the-king-jrr-tolkien/14819630
```

```
dt: The Return of the King Ebook by J.R.R. Tolkien | hoopla
en: page_view
```

101. The Tag is also able to determine when a user borrows a book from the Hoopla Service, as depicted in the following screenshotted network transmission:

```
dt: The Return of the King Ebook by J.R.R. Tolkien | hoopla
en: borrow_button
```

102. Notably, the Tag also intercepts the contents of a user's communications with the Hoopla Service when a user views a video. The following screenshot of the network transmissions shows the Tag intercepting a user's communications with Defendant where the user viewed the *Titanic* movie:

```
dl: https://www.hoopladigital.com/movie/titanic-leonardo-dicaprio/11988416
dr: https://www.hoopladigital.com/movies/genre/drama/317951475
sid: 1740689490
sct: 4
seg: 1
dt: Titanic (1997) Movie | hoopla
en: page_view
```

103. Just as with reading materials, the Tag also intercepts users' communications with Defendant that indicate the borrowing of videos. The following network transmission shows a user borrowing the *Titanic* movie:

```
dl: https://www.hoopladigital.com/movie/titanic-leonardo-dicaprio/11988416
dr: https://www.hoopladigital.com/movies/genre/drama/317951475
dt: Titanic (1997) Movie | hoopla
en: borrow_button
```

104. The Tag also intercepts users' communications with the Website that search for, view, access, and play rental materials accessed through a BingePass. A Hoopla BingePass is a singular borrow that "allows patrons to stream entire collections and platforms for seven days."[81]

105. For example, the following screenshot captures Google intercepting a user's communications with the Website and obtaining its contents which inform Google that the user viewed the Hoopla "Asian Crush" BingePass:

**▾Request Payload**

```
en=page_view&_et=7254
en=page_view&_et=4403&dl=https%3A%2F%2Fwww.hoopladigital.com%2Fbingepass%2Fasiancrush-bingepass%2F
17107735&dr=https%3A%2F%2Fwww.hoopladigital.com%2Fbrowse%2Fbinge&dt=AsianCrush%20BingePass%20%7C%2
0hoopla
```

[81] BINGEPASS, MIDWEST TAPE, https://library.hoopladigital.com/bingepass/.

106. In addition, the following screenshot demonstrates how Google intercepts a user's communications borrowing a BingePass called "Asian Crush":


```
▾Form Data    view source    view URL-encoded
name: patron_borrowed_content
user_data: {"http_origin":"https://www.hoopladigital.com/bingepass/asiancrush-bingepass/17107735","user_agent":"Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/133.0.0.0 Safari/537.36","language":"EN","screen_width":1920,"screen_height":1080,"http_referrer":"https://www.google.com/","browser_fingerprint_id":"1392157434591263278","sdk":"web","sdk_version":"2.86.3","os_version":"19"}
```


107. To identify individual website users, Google cookies allow Google Analytics to "'remember' what a user has done on previous pages [and their] interactions with the [W]ebsite."[82]

108. The following image confirms that, when a user accesses the Website while logged in to a Google account, the Google tracking technologies on the Website compel that user's browser to transmit several Google cookies, including but not limited to the ar_debug cookie:


```
×  Headers  Payload  Preview  Response  Initiator  Timing  Cookies
▸ Response Headers (14)
▾ Request Headers
:authority:        www.google-analytics.com
:method:           POST
:path:             /g/collect?v=2&tid=G-9KNEL8H79D&gtm=45je53c0v9192619341za200zb9192235218&_p=1741889680102&gcd=13l3l3l3l1l1&npa=0&dma=0&tag_exp=102482433~102587591~102640600~102717422~102788824~102791784~102814060~102825837&cid=128101992.1740588350&ul=en-us&sr=1920x1080&uaa=x86&uab=64&uafvl=Chromium%3B134.0.6998.89%7CNot%253AA-Brand%3B24.0.0.0%7CGoogle%2520Chrome%3B134.0.6998.89&uamb=0&uam=&uap=Windows&uapv=19.0.0&uaw=0&are=1&frm=0&pscdl=noapi&_eu=AEA&_s=6&dl=https%3A%2F%2Fwww.hoopladigital.com%2Fbrowse%2Fmovie%2Fpopular&dr=https%3A%2F%2Fwww.hoopladigital.com%2Fmovie%2Ftitanic-leonardo-dicaprio%2F11988416&sid=1741888683&sct=5&seg=1&dt=Watch%20free%20popular%20Movies%20%7C%20hoopla&en=page_view&_et=1221&tfd=86278
:scheme:           https
Accept:            */*
Accept-Encoding:   gzip, deflate, br, zstd
Accept-Language:   en-US,en;q=0.9
Content-Length:    0
Cookie:            ar_debug=1
```


[82] GOOGLE, GOOGLE ANALYTICS COOKIE USAGE ON WEBSITES, https://web.archive.org/web/20240303080533/https://developers.google.com/analytics/devguides/collection/analyticsjs/cookie-usage.

109. The ar_debug cookie is used to "[s]tore and track conversions[.]"[83] The ar_debug cookie has a lifespan of 90 days.[84]

110. Google, at a minimum, uses the ar_debug cookie to analyze each individual user and their actions in searching for, borrowing, and viewing reading and video materials on the Hoopla Service.

### C. IP Address

111. In addition, both of the Third Parties receive users' IP addresses with each intercepted communication on the Website.[85]

112. An IP address is a "unique number that's assigned to every computer or other device that connects to the Internet."[86] IP addresses "can often be used to identify the location from which a computer is connecting to the Internet."[87] And when a user "send[s] or request[s] information online, [their] IP address acts as an identifier so the information can reach [their] specific device."[88] Therefore, an IP address is required for users to use the Internet and, in this case, is required to be able to search for and review reading materials on the Website.

## V. DEFENDANT DISCLOSES USERS' PII AND BORROWING HISTORY FOR THE PURPOSES OF MARKETING, ADVERTISING, AND ANALYTICS

113. Defendant transmits the foregoing personally identifiable information and record of materials viewed and obtained on the Hoopla Service to the Third Parties so that Facebook and Google can help Defendant launch marketing campaigns, target specific users with advertising, and analyze Website users' data.

---

[83] *Id.*

[84] GOOGLE, OUR ADVERTISING AND MEASUREMENT COOKIES, https://business.safety.google/adscookies.

[85] *See, e.g.*, GOOGLE, IP ADDRESS, https://support.google.com/google-ads/answer/6322?hl=en&sjid=10351485279015731074-NA; META, PRIVACY CENTER, https://www.facebook.com/privacy/dialog/what-location-information-does-meta-receive/ ("We're also able to receive location information from the network you connect your device to, including your IP address and Wi-Fi connection.").

[86] *Id.*

[87] *Id.*

[88] Norton, *What is an IP Address*, Blog, https://us.norton.com/blog/privacy/what-is-an-ip-address.

### A. Facebook

114. The Pixel gathers information to be used for marketing and advertising.

115. Specifically, Facebook's technological suite allows it to "track website visitors' actions[,] also known as conversion tracking[,] ... [which] can be used to analyze the effectiveness of [a] conversion funnel and to calculate [] return[s] on ad investment[s]."[89] Once a client is "tracking conversions, [Facebook] recommend[s] that [the client] use them to … optimize [] ads for website conversions."[90]

116. A "custom audience is an ad targeting option"[91] that can be used by advertisers, like Defendant, "to find people most likely to respond to [their] ad[s]."[92] Clients can "[c]reate [an] online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their] ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most likely to take action. Once [an] ad starts running, [Facebook's] system will learn who is engaging with it and, over time, narrow [the] audience [to help] reach more of the right people."[93] Advertisers can target, *inter alia*, "[n]ew customers with specific interests or from a specific location"; "[p]eople who have already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's] current customers."[94]

117. In short, Facebook states[95] that the Pixel can be used to:

- Make sure your ads are shown to the right people. Find new customers, or people who have visited a specific page or taken a desired action on your website.

---

[89] FACEBOOK, CONVERSION TRACKING, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[90] *Id.*

[91] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227.

[92] FACEBOOK, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[93] *Id.*

[94] *Id.*

[95] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153.

- Drive more sales. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.
- Measure the results of your ads. Better understand the impact of your ads by measuring what happens when people see them.

118. Gathered information is also used for analytics. Namely, the Pixel helps "understand[] the actions people take on [a] website."[96] "Examples of actions include adding an item to their shopping cart or making a purchase. The Pixel receives these actions, or events, which [] can [be] view[ed] on [the] Meta Pixel page in [the Facebook] Events Manager. From there, [a client will] be able to see the actions that [its] customers take."[97] This allows Facebook clients to "segment [their] website visitors into groups based on the actions they have taken on [their] website."[98] Additionally, with the Pixel, clients can "[a]dd events on the pages that matter to [their] business to help [] understand [] customers' journey[s]. If [one were to] set up events along their path (for example, from product page views to a purchase) it may help [] measure and optimize [] ads for the conversions that mean the most to [one's] business."[99]

119. Defendant uses the Pixel for such marketing, advertising, and analytics purposes. Defendant obtains revenue from the libraries it provides its catalog to. Defendant knows that its ability to generate revenue depends in large part on the quality of its digital catalog content. Therefore, Defendant employs the Pixel to spy on users and intercept the communications of users viewing and obtaining reading material and video materials. Defendant then gathers that information and catalogs it, creating an individualized profile of each user.

---

[96] *Id.*

[97] *Id.*

[98] FACEBOOK, CUSTOM AUDIENCES, https://developers.facebook.com/docs/meta-pixel/implementation/custom-audiences.

[99] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005.

**B. Google**

120. Google similarly uses the captured user data and private reading and video-viewing records for marketing, advertising, and analytics purposes. In its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "When Google Analytics customers enable the data sharing setting for … Google Analytics[] and accept the 'Measurement Controller-Controller Data Protection Terms' … Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance."[100]

121. Thus, Google has the capability to use the wiretapped data for understanding online behavior and trends, machine learning, and improving its products and services.

122. Defendant analyzes large masses of this user profile information to locate trends and adjust its digital content accordingly.

**CLASS ACTION ALLEGATIONS**

123. Class Definition: Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and other similarly situated individuals defined as all persons in the state of California who United States who, during the class period, had their personally identifiable information or protected reading and video-viewing library records intercepted by Facebook, Google, and other third party entities, as a result of using the Website (the "Class").

124. Plaintiffs reserve the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

---

[100] GOOGLE, SHARED DATA UNDER MEASUREMENT CONTROLLER-CONTROLLER DATA PROTECTION TERMS, https://support.google.com/analytics/answer/9024351.

125. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

126. Excluded from the Class is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

127. Numerosity/Ascertainability. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Facebook and Google.

128. Typicality. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs used the Website and, as a result of Defendant's unlawful conduct, had their personally identifiable information and video-viewing and private reading information intercepted by Facebook and Google without their express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

129. Adequacy. Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of data privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

130. Common Questions of Law and Fact Predominate/Well Defined Community of Interest. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on

grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Class include:

(a) Whether Defendant intentionally tapped the lines of internet communication between account holders and the Hoopla Service;

(b) Whether the Website (including hoopladigital.com) contains code that permits the Third Parties to intercept users' personally identifiable information, protected reading information, protected video-viewing information, and related communications;

(c) Whether Facebook is a third-party eavesdropper;

(d) Whether Google is a third-party eavesdropper;

(e) Whether Defendant knowingly integrated third-party technology and allowed users' personally identifiable information and library use records to be intercepted by Facebook and Google;

(f) Whether Plaintiffs' and Class Members' communications via the Website and the resultant interceptions thereof constitute an affirmative act of communication;

(g) Whether Defendant's conduct, which allowed Facebook—an unauthorized person—to view Plaintiffs' and Class Members' personally identifiable information and library materials search and borrowing record, resulted in a breach of confidentiality;

(h) Whether Defendant violated Plaintiffs' and Class Members' privacy rights by using third-party technology, such as the Facebook Pixel and the Google Tag, to allow third parties to intercept users' online communications along with information that uniquely identified the individuals;

(i) Whether Plaintiffs and Class Members are entitled to damages under CIPA, the California Civil Code, or any other relevant statute; and

(j) Whether Defendant's actions violate Plaintiffs' and Members of the Class' privacy rights as provided by the California Constitution.

131. Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not

practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf Of The Class)**

132. Plaintiffs Smith and Tran repeat the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

133. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications." Cal. Penal Code § 630.

134. A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

Cal. Penal Code § 631(a).

135. Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

136. To avoid liability under § 631(a), a defendant must show it had the consent of all parties to a communication.

137. At all relevant times, Defendant aided, agreed with, and conspired with third parties, including, Facebook, to track and intercept Plaintiffs' and Class Members' internet communications while accessing the Website. These communications were intercepted without the authorization and consent of Plaintiffs and Class Members.

138. Defendant, when aiding and assisting the wiretapping by Facebook and Google, intended to help the Third Parties learn some meaning of the content in the URLs and the content within the network transmissions that the user viewed or requested.

139. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Pixel and the Google Tag fall under the broad catch-all category of "any other manner":

a. The computer codes and programs the Third Parties used to track Plaintiffs' and Class Members' communications while they were navigating the Website;

b. Plaintiffs' and Class Members' browsers;

c. Plaintiffs' and Class Members' computing and mobile devices;

d. Facebook's web and ad servers;

e. Google's web and ad servers;

f. The web and ad-servers from which the Third Parties tracked and intercepted Plaintiffs' and Class Members' communications while they were using a web browser to access or navigate the Website;

g. The computer codes and programs used by the Third Parties to effectuate its tracking and interception of the Plaintiffs' and Class Members' communications while they were using a browser to visit Defendant's Website; and

h. The plan the Third Parties carried out to effectuate their tracking and interception of the Plaintiffs' and Class Members' communications while they were using a web browser to visit Defendant's website.

140. The library use records that Defendant permitted the Third Parties to intercept via the Website's integration of the Facebook Pixel and the Google Tag, including users' history of borrowed and viewed reading and audiobook materials, constitutes protected information.

141. As demonstrated above, Defendant violated the CIPA by aiding and permitting third parties to receive its users' online communications through the Website without their consent.

142. As a result of the above violations, Defendant is liable to Plaintiffs and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages. Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

143. Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## COUNT II

**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf Of The Class)**

144. Plaintiffs Smith and Tran incorporate the preceding paragraphs as if fully set forth herein.

145. Plaintiffs bring this claim against Defendant individually and on behalf of the Class.

146. CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on

> among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

147. Facebook's Business Tools, including but not limited to the Facebook Pixel, as well as Google's Analytics and Analytics 4 toolkit, including but not limited to the Google Tag, are "electronic amplifying or recording device[s]."

148. Cal. Gov. Code § 7927.105 states that a "patron use record[]" includes both:

> (1) Any written or electronic record that is used to identify a library patron and is provided by the patron to become eligible to borrow or use books and other materials. This includes, but is not limited to, a patron's name, address, telephone number, or email address.
>
> And
>
> (2) Any written record or electronic transaction that identifies a patron's borrowing information or use of library information resources. This includes, but is not limited to, database search records, borrowing records, class records, and any other personally identifiable uses of library resources, information requests, or inquiries.

149. Cal. Civ. Code § 1798.90 states that "personal information" means:

> (A) Any information that identifies, relates to, describes, or is associated with a particular user, including, but not limited to, the information specifically listed in Section 1798.80.
>
> (B) A unique identifier or Internet Protocol address, when that identifier or address is used to identify, relate to, describe, or be associated with a particular user or book, in whole or in partial form.
>
> (C) Any information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book, in whole or in partial form.

150. Accordingly, any information that "is used to identify a library patron," "identifies, relates to, describes, or is associated with a particular user" of a book service, "identifies a patron's borrowing information or use of library information resources," constitutes a "unique identifier [that] … is used to identify, relate to, describe, or be associated with a particular user or book," or "relates to, or is capable of being associated with a particular user's access to or use of a book service or a book" qualifies as protected information under California law. Plaintiffs and Class

Members accordingly had a privacy right to keep their library use records with the Hoopla Service confidential.

151. Specifically, the following pieces of information provided by Plaintiffs and Class Members to the Website constitute private, protected information: user's FIDs (and through them, their publicly available Facebook accounts), cookies associated with user events and intercepted by the Tag, users' IP addresses, users' specific library search and view requests on the Hoopla Service, and users' borrowed library materials on the Hoopla Service.

152. At all relevant times, Facebook intentionally used its Business Tools to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members, on the one hand, and Defendant, on the other. At all relevant times, Google intentionally used its Google Analytics and Google Analytics 4 tools, including but not limited to the Google Tag, to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members, on the one hand, and Defendant, on the other.

153. When communicating with Defendant and using the Hoopla Service, Plaintiffs and Class Members had an objectively reasonable expectation of privacy, based on Cal. Gov. Code § 7927.105 and Cal. Civ. Code § 1798.90. Thus, Plaintiffs and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Facebook and Google, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

154. Plaintiffs and Class Members did not consent to any of the Third Party's actions. Nor have Plaintiffs or Class Members consented to Facebook and Google's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

155. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

**<u>COUNT III</u>**
**California Civil Code § 1799.3**
**(On Behalf Of The Class)**

156. Plaintiff Tran hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

157. Plaintiff Tran brings this claim individually and on behalf of the members of the proposed Class against Defendant.

158. Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales … services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

159. Hoopla is a "person providing video recording sales … services" because it sells access to its online, which hosts and delivers thousands of videos on the Hoopla Service platform.[101]

160. Hoopla disclosed consumers' PII to the Third Parties by way of the Third Parties' respective wiretapping technology. This disclosure includes the full titles of the videos that users search for and view, as well as the full titles of the videos that users borrow and watch alongside users' personally identifying information.

161. Plaintiff Tran and Class Members viewed, borrowed, and played videos on the Hoopla Service.

162. Hoopla willfully disclosed Plaintiff Tran's and Class Members' PII because it used that data for audience measurement, marketing, market research, advertising, and other data collection and analysis purposes.

163. Plaintiff Tran and Class Members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to the Third Parties.

164. On behalf of herself and the Class, Plaintiff Tran seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff Tran and the Class

---

[101] *See Building a Digital Collection with Hoopla*, HOOPLA (Oct. 21, 2024), https://library.hoopladigital.com/hoopla-hub/building-a-digital-collection-with-hoopla/.

by requiring Defendant to comply with Cal. Civ. Code § 1799.3's requirements for protecting a consumer's PII; (iii) statutory damages of $500 for each violation of this law pursuant to Cal. Civ. Code § 1799.3(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**COUNT IV**
**Invasion Of Privacy Under California's Constitution**
**(On Behalf Of The Class)**

165. Plaintiffs Smith and Tran repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

166. Plaintiffs and Class Members have an interested in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiffs' and Class Members' knowledge or consent.

167. At all relevant times, by using the Facebook Pixel and Google Tag to record and communicate users' FIDs, IP addresses, and first party cookies alongside their protected reading and video-viewing rental activity, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights under the California Constitution.

168. Plaintiffs and Class Members had a reasonable expectation that their communications, identity, video-viewing information, and reading information would remain confidential and that Defendant would not install wiretaps such as the Pixel and the Tag on the Website.

169. Plaintiffs and Class Members did not authorize Defendant to record and transmit Plaintiffs and Class Members' protected reading and video-viewing history alongside their personally identifiable information to third parties such as Facebook and Google.

170. This invasion of privacy is serious in nature, scope, and impact because it relates to users' protected communications requesting or obtaining videos and reading materials. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

171. Accordingly, Plaintiffs and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Smith and Tran pray for relief and judgment, as follows:

a. For a determination that this action is a proper class action;

b. For an order certifying the Class, naming Plaintiffs as representative of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

e. For an award of compensatory damages, including statutory damages where available, to Plaintiffs and Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f. For punitive damages, as warranted, in an amount to be determined at trial;

g. For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h. For prejudgment interest on all amounts awarded;

i. For injunctive relief as pleaded or as the Court may deem proper;

j. For an order awarding Plaintiffs and Class Members their reasonable attorneys' fees and expenses and costs of suit; and

k. For an order granting Plaintiffs and Class Members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs Smith and Tran, on behalf of themselves and the proposed Class, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: March 18, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *___/s/ Philip Fraietta___*
Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7408
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ehorne@bursor.com

*Attorneys for Plaintiffs and the Putative Class*